# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-IA-01185-SCT

*RUSH HEALTH SYSTEMS, INC., D/B/A RUSH
FOUNDATION HOSPITAL*

*v.*

*MONICA SPARROW*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/07/2024 |
| TRIAL JUDGE: | HON. CHARLES W. WRIGHT, JR. |
| TRIAL COURT ATTORNEYS: | CHRISTOPHER MICHAEL FALGOUT |
| | ROBERT D. JONES |
| | J. RICHARD BARRY |
| | RIMEN BRAR SINGH |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. RICHARD BARRY |
| | RIMEN BRAR SINGH |
| ATTORNEYS FOR APPELLEE: | CHRISTOPHER MICHAEL FALGOUT |
| | ROBERT D. JONES |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED AND REMANDED - 04/16/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Monica Sparrow slipped and fell on a drainage grate while exiting an employee parking garage at Rush Health Systems, Inc., d/b/a Rush Foundation Hospital (Rush). The trial court denied Rush's motion for summary judgment and found that genuine issues of material fact remained in dispute. Because Sparrow presented testimony that she was specifically directed by a nurse to exit the employee parking garage, that the parking garage

was poorly lit, that the drainage grate was partially concealed, and that the metal grate was very slick to the touch and shifted when body weight was placed upon it, we affirm the decision of the trial court and remand this case for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶2.     In August 2020, Sparrow's daughter Kristen Carlisle was pregnant and was having blood-pressure issues that limited her ability to drive. Therefore, Sparrow accompanied Carlisle to an appointment at Rush. At that time, the hospital was operating under COVID-19 restrictions and had limited entrances into the hospital in order to screen the public and employees when they entered the building for COVID symptoms. Sparrow testified that medical personnel had instructed Carlisle to enter the hospital through the emergency room so they could be checked for COVID symptoms before entering the obstetrics area. Accordingly, Sparrow parked in front of the emergency-room entrance. After entering the hospital, Carlisle and Sparrow were checked for COVID symptoms and were then escorted to the obstetrics floor.

¶3.     Because Carlisle's blood pressure was elevated, her doctor instructed her to stay so that she could be monitored. Sparrow testified that, while Carlisle was being monitored, it began to rain. There was also a light fog. At approximately 8:00 p.m., Carlisle was released to leave and was put in a wheelchair that was being pushed by Carlisle's obstetrics nurse. Sparrow stated that she asked the nurse where she needed to move the car in order to pick up Carlisle. According to Sparrow, the nurse stated that COVID policies required the staff to take patients out of certain exits. Sparrow testified that the nurse asked if she knew where

2

the employee parking deck beside the emergency room was located. Sparrow responded that she knew where the parking deck was but not how to get there. Sparrow stated that the nurse informed her that she could follow her to the employee parking deck. According to Sparrow, when they arrived at the exit leading to the parking deck, the nurse told Sparrow to go through the parking deck and then to take a left at the opening to get back to the emergency-room entrance where she had parked. Sparrow did not know the name of the nurse but testified that she had been her daughter's nurse that day and had long blonde hair. This nurse has not yet been identified.

¶4.     At the time that Sparrow began to exit the hospital, it had stopped raining but was misting. Sparrow, who was wearing a pair of flip flops, walked through the employee parking deck and through the left side of the large automobile exit. The automobile exit measured approximately twenty-six feet wide. From Sparrow's viewpoint, a metal drainage grate was located on the left side of the automobile exit and measured four-feet, nine-and-a-half inches deep and five-feet, five-and-a-half inches wide. The metal grate was approximately six inches from the left concrete walkway outside the parking garage. As Sparrow reached the end of the parking deck, she stepped on the metal grate; her right foot slipped out from under her, and her left knee buckled, causing her to fall onto her left knee. Sparrow testified that she had been worried about her daughter and grandson and that she had not seen the grate before she stepped on it. Thereafter, Sparrow was unable to move from her position on the drainage grate. A Rush employee found Sparrow sitting on the grate after her fall and called a security officer. The security officer then arrived with a wheelchair, but medical staff had

to lift Sparrow to put her into the wheelchair and take her to the emergency room. Sparrow's fall resulted in a complete transverse fracture of the mid-waist left patella that required surgery two days later.

¶5.     Sparrow filed a complaint against Rush and claimed that Rush had required her to exit the hospital through an unreasonably dangerous route and had failed to warn her of the unreasonably dangerous area. Rush subsequently filed a motion for summary judgment and argued that the metal grate was open and obvious and that no unreasonably dangerous condition existed. Rush further argued that Sparrow was a licensee and that no evidence had been presented that Rush willfully or wantonly injured her.

¶6.     Sparrow contended that the employee parking deck had been poorly lit and that the metal grate had been partially concealed due to rain water. Sparrow additionally argued that the metal grate was not securely flat and flush in its housing and that it had shifted upward when she had stepped on it. The trial court denied summary judgment and found that the evidence presented by Rush was insufficient to show that Sparrow would be unable to prove any facts to support her claim.

¶7.     Rush appealed and raised two issues: 1) whether Sparrow produced evidence that she was injured by a dangerous condition; and 2) whether, in the alternative, Sparrow was a licensee and failed to show that Rush had willfully or wantonly injured her.

**ANALYSIS**

¶8.     "This Court reviews a trial court's decision to grant or deny summary judgment de novo." *City of Jackson v. Maxie ex rel. M.Y.*, 412 So. 3d 1156, 1159 (Miss. 2025) (citing

4

*Monsanto Co. v. Hall*, 912 So. 2d 134, 136 (Miss. 2005)). All evidence is taken into consideration, "including admissions in pleadings, answers to interrogatories, depositions, affidavits and exhibits." *Id.* (citing *Turner v. Johnson*, 498 So. 2d 389, 391 (Miss. 1986)). "The evidence must be viewed in the light most favorable to the party against whom the motion has been made, and the moving party bears the burden of demonstrating that no genuine issue of material fact exists." *Anderson v. Wiggins*, 331 So. 3d 1, 4 (Miss. 2020) (internal quotation marks omitted) (quoting *Moore v. Delta Reg'l Med. Ctr.*, 23 So. 3d 541, 544 (Miss. Ct. App. 2009)). "[I]f there is doubt as to whether or not a fact issue exists, it should be resolved in favor of the non-moving party." *Id.* (internal quotation marks omitted) (quoting *Neely v. N. Miss. Med. Ctr., Inc.*, 996 So. 2d 726, 729 (Miss. 2008)).

## I. Whether Sparrow produced evidence that she was injured by a dangerous condition.

¶9. Rush first argued that Sparrow failed to produce evidence that her fall can be attributed to a dangerous condition. In contrast, Sparrow avers that the slick, partially concealed drainage grate was a dangerous condition that caused her to fall and sustain injuries.

¶10. "Premises liability is a 'theory of negligence that establishes the duty owed to someone injured on a landowner's premises as a result of "conditions or activities" on the land . . . .'" *Venture, Inc. v. Harris*, 307 So. 3d 427, 432 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting *Johnson v. Goodson*, 267 So. 3d 774, 777 (Miss. 2019)).

5

Mississippi applies a three-step process to determine premises liability. The first step consists of classifying the status of the injured person as an invitee, licensee, or a trespasser. Following this identification, the duty which was owed to the injured party is determined. The third step is to determine whether this duty was breached by the landowner or business operator. The determination of which status a particular plaintiff holds can be a jury question, but where the facts are not in dispute the classification becomes a question of law for the trial judge.

*Id.* at 433 (quoting *Leffler v. Sharp*, 891 So. 2d 152, 156 (Miss. 2004)).

¶11. Because Sparrow walked through an employee parking garage, Rush does not concede that Sparrow was an invitee at the time that she fell. For purposes of the first issue, however, Rush alleges that even assuming that Sparrow was an invitee, she still failed to show that the drainage grate was a dangerous condition. "[A]n invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage . . . ." *Corley v. Evans*, 835 So. 2d 30, 37 (Miss. 2003) (second alteration in original) (quoting *Hoffman v. Planters Gin Co.*, 358 So. 2d 1008, 1011 (Miss. 1978)). If Sparrow was an invitee, Rush owed her a duty "to keep its premises in a reasonably safe condition and to warn . . . of dangerous conditions that are not readily apparent." *Thomas v. Boyd Biloxi LLC*, 360 So. 3d 204, 213 (Miss. 2023) (alteration in original) (internal quotation marks omitted) (quoting *Clinton Healthcare, LLC v. Atkinson*, 294 So. 3d 66, 71 (Miss. 2019)). "[T]here is no liability for injuries, where the condition is not dangerous . . . ." *Id.* (second alteration in original) (internal quotation marks omitted) (quoting *Harris*, 307 So. 3d at 433).

¶12. This Court has distinguished cases that "involved dangers which are usual and which customers normally expect to encounter on the business premises, such as thresholds, curbs, and steps" from those cases involving a "physical defect

6

on the defendant's premises condition which may be found to be unusual and unreasonably dangerous . . . ."

*Harris*, 307 So. 3d at 433 (alteration in original) (quoting *Tate v. S. Jitney Jungle Co.*, 650 So. 2d 1347, 1351 (Miss. 1995)). "In general, undamaged common architectural conditions such as thresholds are not dangerous conditions." *Lasseter v. AWH-BP Jackson Hotel, LLC*, 380 So. 3d 232, 236 (Miss. 2024) (citing *McGovern v. Scarborough*, 566 So. 2d 1225, 1228 (Miss. 1990)).

¶13.    After Carlisle's doctor released her, her nurse brought in a wheelchair for her to exit the hospital. Sparrow testified that she asked her daughter's nurse where she needed to drive her car in order to pick her daughter up:

> And [the nurse] said,[b]ecause of COVID, there's only certain exits we can take you out—patients out. She said, [d]o you know where the employee parking deck is beside the emergency room? I said, I do know where it's at, but I don't know how to get to it because I've never been there. She said, [w]ell, this is what we'll do. You just follow me out. And we went to that exit that takes you to that parking deck, employee parking deck, and she said, [y]ou can go out this door, go out the end. It takes you right around to the emergency room where you're parked, and you can come back in and loop through and pick [your daughter] up here at this exit. I said okay.

Sparrow did not know the name of the nurse who had instructed her to exit through the employee parking garage but testified that she had long, blonde hair, that she worked on the OB floor, and that she had been her daughter's nurse that day.

¶14.    Sparrow testified that she had no idea how to get to where the nurse wanted her to go because the nurse told her: "We can only exit out certain exits. This is one, and this one. But I'm going to—we're going to use this one." Thus, she followed the nurse's instructions. According to Sparrow, when the nurse arrived at the employee parking garage exit, she

7

opened the door leading into the parking garage and stated, "[y]ou go down this way, and at the end, you're going to take a left and you're going to be right there at the ER. There's a sidewalk, and you can walk right across to your vehicle." She testified that the nurse told her that when she got "down to the end down where the open tunnel is, you take a left."

¶15.   Sparrow stated that, as she was walking out, she walked to the left side of the large opening because the nurse had instructed her to do so and because it was a parking deck and she did not want to walk out in the middle of the opening. Sparrow admitted that she had not seen the drainage grate before she stepped on it. She said that she had been in "unfamiliar territory" and was walking and was not looking down. When opposing counsel asked Sparrow if she had been looking at the grate before she walked on it, she responded: "I was not looking at the grate. I'm just going to tell you this. My daughter had just come from the—she was carrying my grandson. My mind was not on this at the time, I'm just going to be honest." Opposing counsel then asked Sparrow if she would have walked around the grate if she had been looking. Sparrow answered: "Maybe. I don't know. Sometimes when I'm parked in a parking deck, I don't walk around a grate. Maybe, maybe not. I'm not going to tell y'all what would have happened . . . ."

¶16.   Sparrow stated that when she stepped on the grate it was slick and that it had moved when she stepped on it. During Sparrow's deposition, the following exchange occurred:

Q.     Okay. Why are you claiming Rush is negligent in this lawsuit?

A.     Why do I think they're negligent?

Q.     Yes, ma'am.

A.    I think they're negligent because they didn't have anything there letting people know that that grate was there. And it was slippery. It was very slippery. It was like slime.

Q.    But it wasn't hidden, was it?

A.    No, it was out there in sight. But you know what? They sent me out that door in unfamiliar territory, sir, that I was not—I had no idea that that grate was there.

Q.    Yes, ma'am. But you were also supposed to be watching where you were going, weren't you?

A.    Yes, and I was watching where I was going.

Q.    Were you watching as you walked?

A.    Do you always watch where you walk?

Q.    I do.

A.    Uh-huh. When you got something on your mind, you walk—well, let me just see where I'm going. I try to focus ahead, but, you know, like I said, I had been in the hospital with my daughter. My daughter was not doing well. I had a lot on my mind, and I was just wanting to go and get the vehicle to get my daughter home where she could rest.

Q.    Do you put any percentage of fault on yourself?

      . . . .

A.    No, I don't. I don't think I'm at fault here because I think that if I had been in familiar territory—because like I said, I've worked for Rush. I've used Rush. I've always used Rush. I'm familiar. This place, I was not familiar. For one, I wasn't allowed in this place.

Q.    Yes, ma'am.

A.    You get that, right? And I was told to go out this place that I had no idea where I was going, and it was dark. You've got to understand that, too.

9

Q. There weren't lights in the garage?

A. It was very, very dim. And, you know, if you don't believe me, you go over there—unless they fixed it, go over there and look and go out there when it's dark and see how dimly lit.

Q. It wasn't so dark if you had been watching you would have seen the grate, would you?

A. No, I'm not—look, I'm not going to answer that because I don't believe—I don't believe Rush handled any of this in the correct way, sir.

Counsel for Rush continued to ask Sparrow whether she would have seen the grate if she was looking, and Sparrow continued to state that she did not know or that she was not answering.

¶17. Sparrow additionally testified that when she came back to the hospital for surgery two days after her fall, there was a "[b]ig yellow slippery sign standing right there beside that grate." Sparrow testified that if she had not been instructed by Rush personnel on how to leave the premises, she would not have exited the same way. She stated that she would have exited through the emergency room because that is where she had parked.

¶18. Kennedy, president of Rush at the time, was questioned as to any policies or procedural guidelines that were in effect to establish the entrances and exits of Rush on August 25, 2020. He responded:

[I] honestly don't remember. We had so many changes to the way that we were allowing people in and what entrances to come in throughout COVID, I can't remember—I honestly don't remember this specific day, but all of – those changed so many times I cannot – I can't remember exactly what the policy would have been on what particular day in the craziness that was COVID.

Kennedy testified as follows:

10

Q.    [O]n that particular day, if the plaintiff testifies that she was instructed on an exit route to take, would you have any reason to believe that she's not telling a true statement saying she was provided an exit route?

. . . .

Any particular exit. But in this case, the actual parking garage. If she said she was instructed to exit Rush Hospital through the parking garage, would you have any reason to believe that that would not be a true statement from her?

A.    There's no way for me to know what she would have been told by one of our 3,000 employees.

In Kennedy's interrogatory responses, however, he asserted that Sparrow was giving an untruthful statement by saying that she was instructed on Rush's exit routes for her daughter's hospital appointment on August 25, 2020. He explained that Rush's standard operating procedure "is always to not take visitors out through that area."

¶19.    Kennedy admitted that, during the COVID-19 pandemic, the hospital attempted to narrow down the number of entrances into the hospital in order to protect its patients, employees, and visitors and to comply with federal requirements. Kennedy testified that Rush would have published which entrances were open on its website.

¶20.    Jason Barksdale, Sr., a security officer for Rush, testified that he filled out the incident report after Sparrow's fall. Barksdale stated that he had not seen any standing water or puddling around the drainage grate. He stated, however, that the metal grate was slick to the touch and had no traction. Barksdale additionally testified that during the COVID-19 pandemic, it was practice that individuals would enter the hospital through one area and exit the hospital through another area. He stated that people would come into the hospital through

11

the emergency room to be screened but that they would leave through a different exit. Barksdale testified that people who entered through the emergency room would usually leave from a specialty exit at the back of the building, which resulted in a longer walk back to the emergency-room parking lot.

¶21.    Shaun Miles, expert for Sparrow, submitted an affidavit stating that on May 14, 2024, he visited and inspected Rush's employee parking garage. Miles stated that the metal grate was not one solid piece but was comprised of three individual panels. According to Miles, the metal grate was "extremely slick to the touch" on a dry day; he asserted that the slickness would have been exacerbated if it had been wet. Further, Miles stated that when he placed his body weight on the individual sections of the grates, two of the three moved, shifted, and/or raised out of the housing they were sitting in. He noted that the area to the right of the metal grate, leaving the parking garage, had "very high and significant speed bumps" affixed to the concrete that, in his opinion, would cause a walking hazard to traverse.

¶22.    A man door was located on the left side of the parking garage, if exiting the hospital, approximately fourteen feet from the garage entrance. Miles opined that the door on the left side of the parking garage would not have been clearly visible to a pedestrian exiting the parking garage if there had been cars parked in the parking spots by the door. He could not, however, testify as to whether or not there were any cars parked in those places on the date and time of Sparrow's fall. Miles stated that during his May 2024 visit, he inspected the side door and found that the door was jammed and could not be opened from either side without using his body weight to push against and open the door. Further, no signage indicated that

pedestrians should not exit the parking garage in the manner that Sparrow had exited. Miles opined that Sparrow had traveled the most reasonable path of least resistance that was not hindered by speed-bump hazards. Miles expressed his opinion that the metal grate that Sparrow walked across was not reasonably safe, especially on a wet day, due to its slick character and nature in addition to the movement of the grates when body weight was placed on them. Miles found the grates to be unsafe for pedestrian traffic.

¶23. Brad Carter prepared an expert report for Rush. The report stated in part that, in Carter's opinion, Sparrow had ignored the normal personnel exit door and had ample room to exit the parking garage without the need to walk over the metal grate. Gregory Miller, Carter Miller Sansing, Ltd., testified that he was designated as an expert after his partner Carter had passed away. Miller testified that he did not add to or subtract from Carter's report. Miller stated that before his deposition, he had visited the employee parking garage and had observed the metal grate for approximately five minutes but had not taken any notes.

¶24. Miller stated that the large door in the parking garage was for the purposes of vehicle ingress and egress. He testified that engineers include man doors in parking garages to comply with building codes. When asked how Sparrow would have known to take the man door, Miller testified that he believed that there was an exit sign above the door but could not recall if the exit sign was illuminated or not when he visited. Miller also could not state whether the sign had been illuminated on the night that Sparrow fell. Miller admitted that Sparrow's shortest path would have been to walk out of the large door instead of taking an immediate left and walking almost fourteen feet to exit through the smaller side door. Miller

testified that he walked on the grate and noticed "a deflection" but stated that deflection normally happens with grating. Miller did not measure the deflection rate, however. Miller testified that he would say the deflection rate was acceptable based on the fact that metal grates are designed for cars to run over, and he did not weigh as much as a car. He also stated that he could not give an opinion as to whether the metal grate was slick or rough to the touch.

¶25.   Miller also said in his deposition:

Q.     Okay. Your report goes on further to say—and this is the crux of it—it is my opinion that plaintiff ignored the normal personnel exit door and had ample room to exit the parking garage without the need to walk over the metal grate where she claims she fell. Do you remember that sentence in the report?

A.     May I see that, please?

Q.     Yes. That's going to be the end of the second full paragraph.

A.     Can I have a moment with the attorney, please?

       . . . .

       (Discussion off the record.)

Q.     All right. Mr. Miller, you've now had an opportunity to either review or re-review the expert opinion that Brad Carter gave, correct?

A.     Yes.

Q.     Okay. I need to ask you this question again just for clarification purposes. Prior to today, have you had an opportunity to review the expert report provided by Brad Carter?

A.     I reviewed a report in the file and it is not this report.

Q.     It is not this report?

14

A.     No.

Q.     It is another report done by Brad Carter?

A.     I apologize for the misunderstanding. I took the file as Brad left it on the conference room table and pulled what I thought was the report out. And I don't remember if what I was looking at was before or after this, but it's not the same.

Therefore, serious concerns are apparent from the record regarding whether Miller had even reviewed Carter's report before his deposition testimony.

¶26.    In its motion for summary judgment, Rush argues that the drainage grate was not defective. It contends that drainage grates are inherently meant to collect water and are supposed to get slick. Further, Rush argues that the drainage grate was obvious and was a common architectural feature. According to Rush, drainage grates are not supposed to be prime places to step onto and that Sparrow, through her own lack of attention, did not appreciate the existence of the drainage grate. Rush also points out that the drainage grate had been there for more than twenty years without any known issues or incidences.

¶27.    Sparrow argues that Rush violated its duty to keep its premises in a reasonably safe condition in the following ways:

A.     failing to provide a dry, secure, well lit exit route from services provided from Rush Health Systems, Inc., specifically Rush Foundation Hospital;

B.     failing to provide alternate safe exit routes on the day in question from services provided from Rush Health Systems, Inc., specifically Rush Foundation Hospital.

C.     requiring Plaintiff to exit Rush Health Systems, Inc., specifically Rush Foundation Hospital through an unreasonably dangerous route;

15

D.    failing to have enough employees to secure and monitor the required wet, unstable, and poorly lit exit route;

E.    failing to inspect and guard against the multiple hazards present at the required exit route;

F.    failing to implement a reviewable Covid-19 policy for ingress and egress which can be verbified by others.

G.    such other acts of negligence as may be show in discovery or at trial.

¶28.    Rush stresses that "our law 'has long recognized that normally encountered dangers such as curves, sidewalks, and steps are not hazardous conditions. Often such pathways contain cracks and changes in elevation; and, as such, they do not become hazardous conditions simply because they contain minor imperfections or defects.'" *Cross v. Attala Cnty. Coop.*, 302 So. 3d 205, 208 (Miss. Ct. App. 2020) (quoting *Jones v. Wal-Mart Stores LP*, 187 So. 3d 1100, 1104 (Miss. Ct. App. 2016)). In *Cross*, the plaintiff tripped on a transition in the floor in front of a shelf of flowers. *Id.* at 206. The plaintiff alleged that the transition had been "cracked, chipped, un-level, and unmarked" but stated that she did realize the transition was there and that she did not have difficulty maneuvering the transition. *Id.* at 208. The plaintiff's expert also opined that there was nothing in particular about the shelving configuration would lead a customer reaching for plant to fall. *Id.* at 209. The Court of Appeals concluded that any defect or imperfection in the floor was minor and that the plaintiff had failed to show the existence of a dangerous condition in the floor. *Id.*

¶29.    Rush also cites *Hill v. Central Sunbelt Federal Credit Union*, 349 So. 3d 1181, 1185 (Miss. App. 2022) (quoting *Harris*, 307 So. 3d at 433), and its is holding that a "plaintiff must present evidence to prove the existence of a dangerous condition." There, the plaintiff

16

slipped on wet concrete on the porch area of a credit union. *Id.* at 1183. The plaintiff testified that "the wet surface and the smoothness of the concrete area" had contributed to his fall. *Id.* at 1186 (internal quotation mark omitted). A surveillance video showed that, although the concrete was wet, no puddles or accumulated rain were present on the covered porch area. *Id.* The Court of Appeals found that no evidence had suggested an unreasonably dangerous condition had existed at the time of the plaintiff's fall. *Id.* at 1187.

¶30.    Lastly, Rush cites *McCullar v. Boyd Tunica, Inc.*, 50 So. 3d 1009, 1010 (Miss. Ct. App. 2010), in which a woman had been in the bathroom of a casino's hotel room when a seal broke and water began flowing down from the ceiling above the bathtub, potentially causing the woman to fall. The Court of Appeals concluded that no evidence showed that the casino had created the dangerous condition or that the casino had prior notice of the leak. *Id.* at 1013. The appeals court also pointed out that the leak "took place in a bathroom where employees obviously were neither present nor instructed to monitor continuously." *Id.*

¶31.    Here, Sparrow presented evidence to demonstrate issues of material fact, and the trial court correctly denied summary judgment. Sparrow did not merely allege that the drainage grate was a dangerous condition. Sparrow alleged in her complaint that she was instructed that "she had to exit the premises through a certain area, and/or route" and that her daughter's nurse had directed her and escorted her to the route that was through the employee parking garage. She testified that the parking garage had been poorly lit, that the drainage grate had been partially concealed by rain, and that the drainage grate had been very slippery, "like

17

slime." She further alleged that the grate was not securely flat and flush in its housing and that it had shifted upward when she stepped on it.

¶32. Moreover, although Sparrow's expert visited the premises years later, he corroborated Sparrow's testimony and wrote that the drainage grate had been "extremely slippery" on the dry day he visited and that rain would have exacerbated the slickness. Sparrow's expert also testified that the drainage grate panels had shifted when body weight was placed upon them. In contrast, the plaintiff in *Hill* had not presented expert testimony to support his claim.

¶33. Barksdale, a security officer for Rush, testified that it was practice during the COVID-19 pandemic that individuals would enter the hospital through one area and exit the hospital through another area. He stated that during August 2020, the hospital was admitting people through the emergency room only and that people would leave from areas other than the emergency room. Barksdale also testified that, although he did not see any standing water in the area, the metal grate was smooth, without traction, and slick to the touch.

¶34. Miller, Rush's expert, testified that he had not prepared the expert report and that he had only visited the scene once for five minutes prior to his deposition. Miller had not taken any photos or make any diagrams and had not known under what weather conditions the photos in the report had been taken.

¶35. In *Thomas*, this Court found that a pool deck area that "was slippery and dipped inward" could constitute a dangerous condition. *Thomas*, 360 So. 3d at 214. This Court reasoned that "while water may be a danger 'which [is] usual and which customers normally expect to encounter' on a deck near a swimming pool, a reasonable jury could find that an

18

area that holds water due to how it dips inward and that is slippery due to the substances it holds is a dangerous condition." *Id.* (alteration in original) (citing *Harris*, 307 So. 3d at 433).

¶36. Like in *Thomas*, a drainage grate might be a usual danger; however, a reasonable jury could find that a drainage grate in a poorly lit parking garage that is slippery to the point of being "like slime" and that shifts when it is stepped on is a dangerous condition. Viewing the evidence in the light most favorable to Sparrow, genuine issues of material fact exist as to whether the metal grate was a dangerous condition. Therefore, we affirm the trial court's denial of summary judgment.

**II.     Whether Sparrow remained an invitee when she attempted to exit the hospital through an employee-only parking garage.**

¶37. Rush alternatively argues that Sparrow became a licensee once she entered the employee parking garage. It argues that when Sparrow decided to use the parking garage meant for employees she became a licensee.[1]

¶38. The status of a plaintiff in a premises-liability case may be determined using the following guidelines:

> An invitee enters "the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage." A licensee, however, enters "the property of another for his own convenience, pleasure, or benefit pursuant to the license or implied permission of the owner." When circumstances surrounding the victim's purpose on the property are in dispute, status will be a fact question for a jury to decide. But where there are no factual disputes, status is a question of law for the trial court's determination.

---

[1]Although not precedential to this Court, the Court of Appeals has held that a person visiting a friend at a hospital and escorting the patient's minor son was a business invitee. *Wilson v. Baptist-Mem'l Hosp.-N. Miss., Inc.*, 93 So. 3d 48, 50 (Miss. Ct. App. 2011). The court stated "[o]ur own independent review of the law confirms, as other courts have observed, that the rule is nearly universal that hospital visitors are invitees." *Id.* at 51.

*Cade v. Beard*, 130 So. 3d 77, 81 (Miss. 2014) (citations omitted).

¶39.	This Court previously has held that an apartment tenant's nephew who had visited his uncle and decided to go to the swimming pool at the apartment complex was a trespasser. ***Handy v. Nejam***, 111 So. 3d 610, 612 (Miss. 2013). Because the leasing provision and posted regulations for the apartment complex stated that guests were required to be accompanied by the tenant when they entered the pool area, this Court reasoned that the nephew was an invitee when he entered his uncle's apartment but "lost his status as an invitee when he entered the swimming pool without being accompanied by his uncle." *Id.* at 613 (citing ***Leffler v. Sharp***, 891 So. 2d 152, 154 (Miss. 2004)).

¶40.	Rush cites ***Sharlow v. Raybourn***, 135 So. 3d 238, 240 (Miss. Ct. App. 2014), in which a receptionist at a hair salon entered the salon on a day off for an appointment for a free haircut from one of the stylists. The receptionist left the salon during a rainstorm and slipped and fell on a concrete ramp leading to the parking lot. *Id.* Despite the fact that the salon owner allowed stylists to give free haircuts to employees, the Court of Appeals found that the receptionist had "failed to create a fact question as to whether [the hair salon] received a mutual advantage from her free haircut." *Id.* at 243. The court found relevant that the receptionist had not paid for the haircut but had tipped her stylist and that any tip paid to the stylist was not shared with the hair salon. *Id.* Therefore, the Court of Appeals held that the receptionist was a licensee at the time she fell. *Id.* at 244.

¶41.	Although Rush argues that Sparrow was using the parking garage for her own benefit and convenience, Sparrow testified that Carlisle's nurse had specifically directed her to exit

20

the premises through the employee parking garage and had proceeded to escort her to the parking-garage exit. Sparrow testified that she would not have exited the hospital in that way had she not been instructed to do so. Further, Sparrow testified that when the nurse and she arrived at the exit door leading to the employee parking deck, the nurse opened the door and told Sparrow to go through the parking deck and to take a left at the opening to get back to the emergency-room entrance where she had parked.

¶42. Barksdale testified that, during the COVID-19 pandemic, it was practice that individuals would enter the hospital through one area and be required to exit the hospital through another area. He also explained that people would come into the hospital through the emergency room to be screened but they would leave through a different exit. Kennedy admitted that during the COVID-19 "craziness[,]" the hospital had "so many changes to the way that" the hospital was allowing people to enter the hospital that he could not remember what the hospital's policy was on what particular day. He further stated that there would be no way for him to know what an employee would have told Sparrow regarding an exit route.

¶43. Again, "[w]hen circumstances surrounding the victim's purpose on the property are in dispute, status will be a fact question for a jury to decide." *Cade*, 130 So. 3d at 81 (citing *Little ex rel. Little v. Bell*, 719 So. 2d 757, 760 (Miss. 1998), *overruled on other grounds by Johnson v. Goodson*, 267 So. 3d 774 (Miss. 2019)). Because Sparrow presented evidence that she was instructed to exit the premises through an employee parking garage by one of Rush's employees and was escorted to the employee parking-garage exit, a factual dispute

21

exists as to Sparrow's status as an invitee or licensee at the time of her fall. Therefore, issues of material fact remain, and the trial court correctly denied summary judgment.

## CONCLUSION

¶44. Genuine issues of material fact remain; therefore, the trial court correctly denied Rush's motion for summary judgment. We affirm the judgment of the trial court and remand this case for further proceedings consistent with this opinion.

¶45. **AFFIRMED AND REMANDED.**

**RANDOLPH, C.J., ISHEE AND SULLIVAN, JJ., CONCUR. COLEMAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J. BRANNING, J., NOT PARTICIPATING.**

**COLEMAN, PRESIDING JUSTICE, DISSENTING:**

¶46. The drainage gate upon which the plaintiff slipped is a normal architectural feature and no different from a curb or any other normal architectural feature the like of which do not give rise to a claim for negligence. Accordingly, and with respect, I dissent.

¶47. The Mississippi Supreme Court has long held that common architectural features, such as curbs, sidewalks, and drainage grates, cannot give rise to a successful premises liability claim. In *Stanley v. Morgan & Lindsey, Inc.*, 203 So. 2d 473 (Miss. 1967), the plaintiff, Ivey M. Stanley, fell when stepping off of a sidewalk that was seven-and-one-half inches above the parking lot on to which Stanley fell. *Id.* at 476. Stanley was wearing bifocals and testified that the sun, shining brightly in her face, impeded her ability to see. She testified that customers leaving the defendant store could not see the change in elevation

between the sidewalk and the parking lot. *Id.* The trial court directed the verdict in favor of the defendant, and the Supreme Court affirmed. *Id.* at 477

¶48.     In *McGovern v. Scarborough*, 566 So. 2d 1225 (Miss. 1990), the plaintiff, Tommy McGovern, tripped over a raised door threshold. *Id.* at 1226. The Supreme Court could "find no evidence from which a jury could find this door entrance was not reasonably safe . . . ." *Id.* The *McGovern* Court reviewed a few earlier cases in reaching its holding, including *City of Greenville v. Laury*, 172 Miss. 118, 159 So. 121 (1935), in which the Supreme Court had reversed a judgment in favor of the plaintiff who had fallen on a Greenville city street when the heel of her shoe got stuck in a crevice. *Laury*, 159 So. at 121. The Court noted that the crevice had been there long enough for the city to have constructive notice, *id.*, but nevertheless reversed and rendered a verdict in favor of the defendant city on the ground that the crevice was not of such a nature as to make the street unsafe for use by persons in the exercise of reasonable care. *Id.* at 122. The *McGovern* Court also relied on *Mercy Regional Medical Center v. Doiron*, 348 So. 2d 243 (Miss. 1977), in which the Court reversed and rendered another plaintiff's verdict. There, the plaintiff fell on a stairway that lacked a handrail. *Id.* at 243. The *Doiron* Court wrote as follows:

> In this case the steps were built on the ground which sloped gradually down from the street to the lower parking lot and did not constitute a hazard to one using due care when using them. This case does not fall within the rule that, where facts are undisputed, but reasonable minds may draw different inferences as to negligence therefrom, solution of the issue of negligence should be left to the jury. We are of the opinion that plaintiff's injury belongs to that class of ordinary accidents which are properly imputed to the carelessness or the misfortune of the one injured.

23

*Id.* at 246. In concluding its opinion affirming the directed verdict in favor of the defendant, the *McGovern* Court wrote:

> If this Court were to hold a jury question was made on whether this doorway was not reasonably safe, we would have to say a jury question is made as to any doorway from the street which is not on the same level as the street. Property owners would indeed be insurers of invitees' safety.

*McGovern*, 566 So. 2d at 1228.

¶49. Turning to the case *sub judice*, like the drop from a sidewalk to a parking lot, a crevice in a street, or stairs without a handrail, the drainage grate at issue here is not of such a nature as to support Sparrow's claim for negligence. Like a curb, *see Sessums v. Chicken Nugget, Inc.*, 396 So. 3d 510 (Miss. Ct. App. 2024), an uneven sidewalk, *see Bond v. City of Long Beach*, 908 So. 2d 879 (Miss. Ct. App. 2005), or a sloped ramp, *see Simmons v. City of Picayune*, 417 So. 3d 174 (Miss. Ct. App. 2025), to provide a few examples of persuasive treatments of the issue from our Court of Appeals, the drainage grate was a common architectural feature. In holding that the drainage grate here can support Sparrow's claim for negligence, the majority ignores the warning of the *McGovern* Court and makes Rush the insurer of Sparrow's safety.

**GRIFFIS, J., JOINS THIS OPINION.**

24